**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**ASHEVILLE DIVISION**

---

| | |
|---|---|
| UNITED STATES OF AMERICA,          ) | |
|                      Plaintiff,     ) | |
|                           ) | |
|    v.                      ) | |
|                           ) | Civil No. 16-cv-380 |
| CTS CORPORATION,         ) | |
| MILLS GAP ROAD ASSOCIATES, and  ) | |
| NORTHROP GRUMMAN SYSTEMS    ) | |
| CORPORATION,           ) | |
|                  Defendants.   ) | |

---

**CONSENT DECREE FOR INTERIM REMEDIAL DESIGN/REMEDIAL ACTION AT**
**THE CTS OF ASHEVILLE, INC. SUPERFUND SITE**

---

# TABLE OF CONTENTS

I.      BACKGROUND ..................................................................................................................1
II.     JURISDICTION ...............................................................................................................2
III.    PARTIES BOUND ...........................................................................................................2
IV.     DEFINITIONS .................................................................................................................3
V.      GENERAL PROVISIONS ...............................................................................................5
VI.     PERFORMANCE OF THE WORK..................................................................................6
VII.    REMEDY REVIEW .........................................................................................................8
VIII.   PROPERTY REQUIREMENTS ......................................................................................8
IX.     FINANCIAL ASSURANCE ..........................................................................................11
X.      PAYMENTS FOR FUTURE RESPONSE COSTS ........................................................14
XI.     INDEMNIFICATION AND INSURANCE.....................................................................16
XII.    FORCE MAJEURE.........................................................................................................17
XIII.   DISPUTE RESOLUTION ..............................................................................................18
XIV.    STIPULATED PENALTIES...........................................................................................20
XV.     COVENANTS BY PLAINTIFF......................................................................................23
XVI.    COVENANTS BY SDs....................................................................................................25
XVII.   EFFECT OF SETTLEMENT; CONTRIBUTION ..........................................................27
XVIII.  ACCESS TO INFORMATION .......................................................................................28
XIX.    RETENTION OF RECORDS ..........................................................................................29
XX.     NOTICES AND SUBMISSIONS ...................................................................................30
XXI.    RETENTION OF JURISDICTION..................................................................................31
XXII.   APPENDICES .................................................................................................................31
XXIII.  MODIFICATION ............................................................................................................31
XXIV.   LODGING AND OPPORTUNITY FOR PUBLIC COMMENT ............................................32
XXV.    SIGNATORIES/SERVICE .............................................................................................32
XXVI.   FINAL JUDGMENT .......................................................................................................32

# I.    BACKGROUND

A.    The United States of America ("United States"), on behalf of the Administrator of the United States Environmental Protection Agency ("EPA"), filed a complaint in this matter pursuant to Sections 106 and 107 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9606 and 9607.

B.    The United States in its complaint seeks, *inter alia*: (1) reimbursement of costs incurred by EPA and the Department of Justice ("DOJ") for response actions at the CTS of Asheville, Inc. Superfund Site in Asheville, Buncombe County, North Carolina ("Site"), together with accrued interest; and (2) performance of response actions by the defendants at the Site consistent with the National Contingency Plan, 40 C.F.R. Part 300 ("NCP").

C.    In accordance with the NCP and Section 121(f)(1)(F) of CERCLA, 42 U.S.C. § 9621(f)(1)(F), EPA notified the State of North Carolina (the "State") on May 10, 2016, of negotiations with potentially responsible parties ("PRPs") regarding the implementation of the interim remedial design/remedial action ("RD/RA") for the Site, and EPA has provided the State with an opportunity to participate in such negotiations and be a party to this Consent Decree ("CD").

D.    In accordance with Section 122(j)(1) of CERCLA, 42 U.S.C. § 9622(j)(1), EPA notified the U.S. Department of the Interior and the National Oceanic and Atmospheric Administration on May 10, 2016, of negotiations with PRPs regarding the release of hazardous substances that may have resulted in injury to the natural resources under federal trusteeship and encouraged the trustee(s) to participate in the negotiation of this CD.

F.    The defendants that have entered into this CD ("Settling Defendants" or "SDs") do not admit any liability to Plaintiff arising out of the transactions or occurrences alleged in the complaint, nor do they acknowledge that the release or threatened release of hazardous substances at or from the Site constitutes an imminent and substantial endangerment to the public health or welfare or the environment.

G.    There are two pre-existing administrative orders applicable to the Site (Administrative Order on Consent for Removal Action, Mills Gap Road Groundwater Contamination Site, EPA Docket No. CER-04-2004-3755 (January 16, 2004) and Administrative Settlement Agreement and Order on Consent for Remedial Investigation/Feasibility Study, EPA Docket No. CERCLA-04-2012-3762 (January 26, 2012)).

H.    Pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, EPA placed the Site on the National Priorities List ("NPL"), set forth at 40 C.F.R. Part 300, Appendix B, by publication in the *Federal Register* on March 15, 2012, 77 *Fed. Reg.* 15276.

I.    In response to a release or a substantial threat of a release of a hazardous substances at or from the Site, CTS Corporation completed a Focused Feasibility Study ("FFS") Report on September 21, 2015. CTS submitted a supplemental FFS on November 25, 2015.

J.    Pursuant to Section 117 of CERCLA, 42 U.S.C. § 9617, EPA published notice of the completion of the FFS and of the proposed plan for an interim remedial action on October 1, 2015, in a major local newspaper of general circulation. EPA provided an opportunity for written

and oral comments from the public on the proposed plan for the interim remedial action. A copy of the transcript of the public meeting is available to the public as part of the administrative record upon which the Director of the Superfund Division, EPA Region 4, based the selection of the response action.

K.    The decision by EPA on the interim remedial action to be implemented at the Site is embodied in an Interim Record of Decision ("IROD"), executed on February 11, 2016, on which the State has given its concurrence. The IROD includes EPA's explanation for any significant differences between the IROD and the proposed plan as well as a responsiveness summary to the public comments. Notice of the IROD was published in accordance with Section 117(b) of CERCLA, 42 U.S.C. § 9617(b).

L.    Based on the information presently available to EPA, EPA believes that the Work will be properly and promptly conducted by SDs if conducted in accordance with this CD and its appendices.

M.    Solely for the purposes of Section 113(j) of CERCLA, 42 U.S.C. § 9613(j), the remedy set forth in the IROD and the Work to be performed by SDs shall constitute a response action taken or ordered by the President for which judicial review shall be limited to the administrative record.

N.    The Parties recognize, and the Court by entering this CD finds, that this CD has been negotiated by the Parties in good faith and implementation of this CD will expedite the cleanup of the Site and will avoid prolonged and complicated litigation between the Parties, and that this CD is fair, reasonable, and in the public interest.

NOW, THEREFORE, it is hereby Ordered, Adjudged, and Decreed:

## II.    JURISDICTION

1.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1345, and 42 U.S.C. §§ 9606, 9607, and 9613(b). This Court also has personal jurisdiction over SDs. Solely for the purposes of this CD and the underlying complaint, SDs waive all objections and defenses that they may have to jurisdiction of the Court or to venue in this District. SDs shall not challenge the terms of this CD or this Court's jurisdiction to enter and enforce this CD.

## III.    PARTIES BOUND

2.    This CD is binding upon the United States and upon SDs and their heirs, successors, and assigns. Any change in ownership or corporate or other legal status of a SD including, but not limited to, any transfer of assets or real or personal property, shall in no way alter such SD's responsibilities under this CD.

3.    SDs shall provide a copy of this CD to each contractor hired to perform the Work and to each person representing any SD with respect to the Site or the Work, and shall condition all contracts entered into hereunder upon performance of the Work in conformity with the terms of this CD. SDs or their contractors shall provide written notice of the CD to all subcontractors hired to perform any portion of the Work. SDs shall nonetheless be responsible for ensuring that their contractors and subcontractors perform the Work in accordance with the terms of this CD.

With regard to the activities undertaken pursuant to this CD, each contractor and subcontractor shall be deemed to be in a contractual relationship with SDs within the meaning of Section 107(b)(3) of CERCLA, 42 U.S.C. § 9607(b)(3).

## IV.    DEFINITIONS

4.    Unless otherwise expressly provided in this CD, terms used in this CD that are defined in CERCLA or in regulations promulgated under CERCLA shall have the meaning assigned to them in CERCLA or in such regulations. Whenever terms listed below are used in this CD or its appendices, the following definitions shall apply solely for purposes of this CD:

"Affected Property" shall mean all real property at the Site and any other real property where EPA determines, at any time, that access, land, water, or other resource use restrictions, and/or Institutional Controls are needed to implement the Interim Remedial Action, including, but not limited to all parcels adjacent to the Site.

"CERCLA" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601-9675.

"Consent Decree" or "CD" shall mean this consent decree and all appendices attached hereto (listed in Section XXII). In the event of conflict between this CD and any appendix, this CD shall control.

"Day" or "day" shall mean a calendar day. In computing any period of time under this CD, where the last day would fall on a Saturday, Sunday, or federal or State holiday, the period shall run until the close of business of the next working day.

"DOJ" shall mean the United States Department of Justice and its successor departments, agencies, or instrumentalities.

"Effective Date" shall mean the date upon which the approval of this CD is recorded on the Court's docket.

"EPA" shall mean the United States Environmental Protection Agency and its successor departments, agencies, or instrumentalities.

"EPA Hazardous Substance Superfund" shall mean the Hazardous Substance Superfund established by the Internal Revenue Code, 26 U.S.C. § 9507.

"Future Response Costs" shall mean all costs, including, but not limited to, direct and indirect costs, that the United States incurs in reviewing or developing deliverables submitted pursuant to this CD, in overseeing implementation of the Work, or otherwise implementing, overseeing, or enforcing this CD, including, but not limited to, payroll costs, contractor costs, travel costs, laboratory costs, the costs incurred pursuant to ¶ 11 (Emergencies and Releases), ¶ 12 (Community Involvement) (including the costs of any technical assistance grant under Section 117(e) of CERCLA, 42 U.S.C. § 9617(e)), ¶ 26 (Access to Financial Assurance), Section VII (Remedy Review), Section VIII (Property Requirements) (including the cost of attorney time and any monies paid to secure or enforce access or land, water, or other resource use restrictions and/or to secure, implement, monitor, maintain, or enforce Institutional Controls including the amount of just compensation), and Section XIII (Dispute Resolution), and all

litigation costs. Future Response Costs shall also include all Interim Response Costs and Agency for Toxic Substances and Disease Registry ("ATSDR") costs regarding the Site.

"Interim Record of Decision" or "IROD" shall mean the EPA Record of Decision relating to the Site signed on February 11, 2016, by the Director of the Superfund Division, EPA Region 4, and all attachments thereto. The IROD is attached as *Appendix A*.

"Interim Remedial Action" or "RA" shall mean the remedial action selected in the IROD.

"Interim Response Costs" shall mean all costs, including, but not limited to, direct and indirect costs, (a) paid by the United States in connection with the Site between February 11, 2016, and the Effective Date, or (b) incurred by the United States in connection with the Site between February 11, 2016 and the Effective Date but paid after the Effective Date.

"Interest" shall mean interest at the rate specified for interest on investments of the EPA Hazardous Substance Superfund, compounded annually on October 1 of each year, in accordance with 42 U.S.C. § 9607(a). The applicable rate of interest shall be the rate in effect at the time the interest accrues. The rate of interest is subject to change on October 1 of each year. Rates are available online at http://www2.epa.gov/superfund/superfund-interest-rates.

"National Contingency Plan" or "NCP" shall mean the National Oil and Hazardous Substances Pollution Contingency Plan promulgated pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, codified at 40 C.F.R. Part 300, and any amendments thereto.

"NCDEQ" shall mean the North Carolina Department of Environmental Quality and any successor departments or agencies of the State.

"Non-Settling Owner" shall mean any person, other than a SD, that owns or controls any Affected Property. The clause "Non-Settling Owner's Affected Property" means Affected Property owned or controlled by Non-Settling Owner.

"Operation and Maintenance" or "O&M" shall mean all activities required to operate, maintain, and monitor the effectiveness of the RA as specified in the SOW or any EPA-approved O&M Plan.

"Owner SD" shall mean any SD, including Mills Gap Road Associates, that owns or controls any Affected Property. The clause "Owner SD's Affected Property" means Affected Property owned or controlled by Owner SD.

"Paragraph" or "¶" shall mean a portion of this CD identified by an Arabic numeral or an upper or lower case letter.

"Parties" shall mean the United States and SDs.

"Past Response Costs" shall mean all costs, including, but not limited to, direct and indirect costs, that the United States paid at or in connection with the Site through February 11, 2016, plus Interest on all such costs that has accrued pursuant to 42 U.S.C. § 9607(a) through such date.

"Performance Standards" or "PS" shall mean the cleanup levels and other measures of achievement of the Interim Remedial Action objectives, as set forth in the IROD.

"Plaintiff" shall mean the United States.

"RCRA" shall mean the Solid Waste Disposal Act, 42 U.S.C. §§ 6901-6992 (also known as the Resource Conservation and Recovery Act).

"Remedial Design" or "RD" shall mean those activities to be undertaken by SDs to develop final plans and specifications for the RA as stated in the SOW.

"Section" shall mean a portion of this CD identified by a Roman numeral.

"Settling Defendants" or "SDs" shall mean those Parties identified in *Appendix D*.

"Site" shall mean the CTS of Asheville, Inc. Superfund Site, encompassing approximately nine acres, located at 235 Mills Gap Road in Asheville, Buncombe County, North Carolina, and depicted generally on the map attached as *Appendix C*.

"State" shall mean the State of North Carolina.

"Statement of Work" or "SOW" shall mean the document describing the activities SDs must perform to implement the RD, the RA, and O&M regarding the Site, which is attached as *Appendix B*.

"Supervising Contractor" shall mean the principal contractor retained by SDs to supervise and direct the implementation of the Work under this CD.

"Transfer" shall mean to sell, assign, convey, lease, mortgage, or grant a security interest in, or where used as a noun, a sale, assignment, conveyance, or other disposition of any interest by operation of law or otherwise.

"United States" shall mean the United States of America and each department, agency, and instrumentality of the United States, including EPA.

"Waste Material" shall mean (1) any "hazardous substance" under Section 101(14) of CERCLA, 42 U.S.C. § 9601(14); (2) any pollutant or contaminant under Section 101(33) of CERCLA, 42 U.S.C. § 9601(33); (3) any "solid waste" under Section 1004(27) of RCRA, 42 U.S.C.§ 6903(27); and (4) any "hazardous waste" under Section 130A-290(a)(8) of the General Statutes of North Carolina.

"Work" shall mean all activities and obligations SDs are required to perform under this CD, except the activities required under Section XIX (Retention of Records).

## V.     GENERAL PROVISIONS

5.     **Objectives of the Parties**. The objectives of the Parties in entering into this CD are to protect public health or welfare or the environment by the design and implementation of response actions at the Site by SDs, to pay response costs of Plaintiff, and to resolve the claims of Plaintiff against SDs as provided in this CD.

6. **Commitments by SDs**.

   a.   SDs shall finance and perform the Work in accordance with this CD and all deliverables developed by SDs and approved or modified by EPA pursuant to this CD. SDs shall pay the United States for its response costs as provided in this CD.

   b.   SDs' obligations to finance and perform the Work, including obligations to pay amounts due under this CD, are joint and several. In the event of the insolvency of any SD or the failure by any SD to implement any requirement of this CD, the remaining SDs shall complete all such requirements.

7. **Compliance with Applicable Law**. Nothing in this CD limits SDs' obligations to comply with the requirements of all applicable federal and state laws and regulations. SDs must also comply with all applicable or relevant and appropriate requirements of all federal and state environmental laws as set forth in the IROD and the SOW. The activities conducted pursuant to this CD, if approved by EPA, shall be deemed to be consistent with the NCP as provided in Section 300.700(c)(3)(ii) of the NCP.

8. **Permits**.

   a.   As provided in Section 121(e) of CERCLA, 42 U.S.C. § 9621(e), and Section 300.400(e) of the NCP, no permit shall be required for any portion of the Work conducted entirely on-site (i.e., within the areal extent of contamination or in very close proximity to the contamination and necessary for implementation of the Work). Where any portion of the Work that is not on-site requires a federal or state permit or approval, SDs shall submit timely and complete applications and take all other actions necessary to obtain all such permits or approvals.

   b.   SDs may seek relief under the provisions of Section XII (Force Majeure) for any delay in the performance of the Work resulting from a failure to obtain, or a delay in obtaining, any permit or approval referenced in ¶ 8.a and required for the Work, provided that they have submitted timely and complete applications and taken all other actions necessary to obtain all such permits or approvals.

   c.   This CD is not, and shall not be construed to be, a permit issued pursuant to any federal or state statute or regulation.

## VI.   PERFORMANCE OF THE WORK

9. **Coordination and Supervision**.

   a.   **Project Coordinators**.

      (1)   SDs' Project Coordinator must have sufficient technical expertise to coordinate the Work. SDs' Project Coordinator may not be an attorney representing any SD in this matter and may not act as the Supervising Contractor. SDs' Project Coordinator may assign other representatives, including other contractors, to assist in coordinating the Work.

(2)　　EPA shall designate and notify the SDs of EPA's Project Coordinator and Alternate Project Coordinator. EPA may designate other representatives, which may include its employees, contractors and/or consultants, to oversee the Work. EPA's Project Coordinator/Alternate Project Coordinator will have the same authority as a remedial project manager and/or an on-scene coordinator, as described in the NCP. This includes the authority to halt the Work and/or to conduct or direct any necessary response action when he or she determines that conditions at the Site constitute an emergency or may present an immediate threat to public health or welfare or the environment due to a release or threatened release of Waste Material.

(3)　　SDs' Project Coordinators shall meet with EPA's Project Coordinator in person or by telephone at least monthly.

b.　　**Supervising Contractor**. SDs' proposed Supervising Contractor must have sufficient technical expertise to supervise the Work and a quality assurance system that complies with ANSI/ASQC E4-2004, Quality Systems for Environmental Data and Technology Programs: Requirements with Guidance for Use (American National Standard).

c.　　**Procedures for Disapproval/Notice to Proceed**.

(1)　　SDs shall designate, and notify EPA, within 10 days after the Effective Date, of the names, contact information, and qualifications of the SDs' proposed Project Coordinator and Supervising Contractor.

(2)　　EPA, after a reasonable opportunity for review and comment by the State, shall issue notices of disapproval and/or authorizations to proceed regarding the proposed Project Coordinator and Supervising Contractor, as applicable. If EPA issues a notice of disapproval, SDs shall, within 30 days, submit to EPA a list of supplemental proposed Project Coordinators and/or Supervising Contractors, as applicable, including a description of the qualifications of each. EPA shall issue a notice of disapproval or authorization to proceed regarding each supplemental proposed coordinator and/or contractor. SDs may select any coordinator/contractor covered by an authorization to proceed and shall, within 21 days, notify EPA of SDs' selection.

(3)　　SDs may change their Project Coordinator and/or Supervising Contractor, as applicable, by following the procedures of ¶¶ 9.c(1) and 9.c(2).

10.　　**Performance of Work in Accordance with SOW**. SDs shall: (a) develop the RD; (b) perform the RA; and (c) operate, maintain, and monitor the effectiveness of the RA; all in accordance with the SOW and all EPA-approved, conditionally-approved, or modified deliverables as required by the SOW. All deliverables required to be submitted for approval under the CD or SOW shall be subject to approval by EPA in accordance with ¶ 6.6 (Approval of Deliverables) of the SOW.

11.　　**Emergencies and Releases**. SDs shall comply with the emergency and release response and reporting requirements under ¶ 4.3 (Emergency Response and Reporting) of the SOW. Subject to Section XV (Covenants by Plaintiff), nothing in this CD, including ¶ 4.3 of the SOW, limits any authority of Plaintiff: (a) to take all appropriate action to protect human health and the environment or to prevent, abate, respond to, or minimize an actual or threatened release

of Waste Material on, at, or from the Site, or (b) to direct or order such action, or seek an order from the Court, to protect human health and the environment or to prevent, abate, respond to, or minimize an actual or threatened release of Waste Material on, at, or from the Site. If, due to SDs' failure to take appropriate response action under ¶ 4.3 of the SOW, EPA takes such action instead, SDs shall reimburse EPA under Section X (Payments for Response Costs) for all costs of the response action.

12. **Community Involvement**. If requested by EPA, SDs shall conduct community involvement activities under EPA's oversight as provided for in, and in accordance with, Section 2 (Community Involvement) of the SOW. Such activities may include, but are not limited to, designation of a Community Involvement Coordinator. Costs incurred by the United States under this Section constitute Future Response Costs to be reimbursed under Section X (Payments for Response Costs).

13. **Modification of SOW or Related Deliverables**.

a. If EPA determines that it is necessary to modify the work specified in the SOW and/or in deliverables developed under the SOW in order to achieve and/or maintain the Performance Standards or to carry out and maintain the effectiveness of the RA, and such modification is consistent with the Scope of the Remedy set forth in ¶ 1.3 of the SOW, then EPA may notify SDs of such modification. If SDs object to the modification they may, within 30 days after EPA's notification, seek dispute resolution under Section XIII.

b. The SOW and/or related work plans shall be modified: (1) in accordance with the modification issued by EPA; or (2) if SDs invoke dispute resolution, in accordance with the final resolution of the dispute. The modification shall be incorporated into and enforceable under this CD, and SDs shall implement all work required by such modification. SDs shall incorporate the modification into the deliverable required under the SOW, as appropriate.

c. Nothing in this Paragraph shall be construed to limit EPA's authority to require performance of further response actions as otherwise provided in this CD.

14. Nothing in this CD, the SOW, or any deliverable required under the SOW constitutes a warranty or representation of any kind by Plaintiff that compliance with the work requirements set forth in the SOW or related deliverable will achieve the Performance Standards.

## VII.   REMEDY REVIEW

15. **Periodic Review**. SDs shall conduct, in accordance with ¶ 4.7 (Periodic Review Support Plan) of the SOW, studies and investigations to support EPA's reviews under Section 121(c) of CERCLA, 42 U.S.C. § 9621(c), and applicable regulations, of whether the RA is protective of human health and the environment.

## VIII.   PROPERTY REQUIREMENTS

16. **Agreements Regarding Access and Non-Interference.**

a. **Non-Settling Owners**.  SDs shall, with respect to any Non-Settling Owner's Affected Property, use best efforts to secure from such Non-Settling Owner an agreement, enforceable by SDs and by Plaintiff, providing that such Non-Settling Owner: (i)

provides Plaintiff and the other SDs, and their representatives, contractors, and subcontractors with access at all reasonable times to such Affected Property to conduct any activity regarding the CD, including those listed in ¶ 16.a (Access Requirements); and (ii) refrains from using such Affected Property in any manner that EPA determines will pose an unacceptable risk to human health or to the environment due to exposure to Waste Material, or interfere with or adversely affect the implementation, integrity, or protectiveness of the Interim Remedial Action.

b. **Owner SD**. Owner SD shall, with respect to Owner SD's Affected Property: (i) provide Plaintiff and the other SDs, and their representatives, contractors, and subcontractors with access at all reasonable times to such Affected Property to conduct any activity regarding the CD, including those listed in ¶ 16.a (Access Requirements); and (ii) refrain from using such Affected Property in any manner that EPA determines will pose an unacceptable risk to human health or to the environment due to exposure to Waste Material, or interfere with or adversely affect the implementation, integrity, or protectiveness of the Interim Remedial Action.

c. **Access Requirements**. The following is a list of activities for which access is required regarding the Affected Property:

(1)     Monitoring the Work;

(2)     Verifying any data or information submitted to the United States;

(3)     Conducting investigations regarding contamination at or near the Site;

(4)     Obtaining samples;

(5)     Assessing the need for, planning, or implementing additional response actions at or near the Site;

(6)     Assessing implementation of quality assurance and quality control practices as defined in the approved construction quality assurance quality control plan as provided in the SOW;

(7)     Implementing the Work pursuant to the conditions set forth in ¶ 64 (Work Takeover);

(8)     Inspecting and copying records, operating logs, contracts, or other documents maintained or generated by SDs or their agents, consistent with Section XVIII (Access to Information);

(9)     Assessing SDs' compliance with the CD;

(10)     Determining whether the Affected Property is being used in a manner that is prohibited or restricted, or that may need to be prohibited or restricted under the CD; and

(11)     Implementing, monitoring, maintaining, reporting on, and enforcing any land, water, or other resource use restrictions.

17.     **Best Efforts**. As used in this Section, "best efforts" means the efforts that a reasonable person in the position of SDs would use so as to achieve the goal in a timely manner, including the cost of employing professional assistance and the payment of reasonable sums of money to secure access and/or use restriction agreements. If SDs are unable to accomplish what is required through "best efforts" in a timely manner, they shall notify the United States, and include a description of the steps taken to comply with the requirements. If the United States deems it appropriate, it may assist SDs, or take independent action, in obtaining such access and/or use restrictions. All costs incurred by the United States in providing such assistance or taking such action, including the cost of attorney time and the amount of monetary consideration or just compensation paid, constitute Future Response Costs to be reimbursed under Section X (Payments for Response Costs).

18.     Owner SD shall not Transfer its Affected Property unless it has first secured EPA's approval of, and transferee's consent to, an agreement that: (i) is enforceable by SDs and Plaintiff; and (ii) requires the transferee to provide access to and to refrain from using the Affected Property to the same extent as is provided under ¶ 16.c (Access Requirements).

19.     **Notice to Successors-in-Title**.

        a.      Owner SD shall, within 15 days after the Effective Date, submit for EPA approval a notice to be recorded regarding Owner SD's Affected Property in the appropriate land records. The notice must: (1) include a proper legal description of the Affected Property; (2) provide notice to all successors-in-title: (i) that the Affected Property is part of, or related to, the Site; (ii) that EPA has selected a remedy for the Site; and (iii) that potentially responsible parties have entered into a CD requiring implementation of such remedy; and (3) identify the U.S. District Court in which the CD was filed, the name and civil action number of this case, and the date the CD was entered by the Court. Owner SD shall record the notice within 10 days after EPA's approval of the notice and submit to EPA, within 10 days thereafter, a certified or attested copy of the recorded notice.

        b.      Owner SD shall, prior to entering into a contract to Transfer Owner SD's Affected Property, or 60 days prior to Transferring Owner SD's Affected Property, whichever is earlier:

                (1)     Notify the proposed transferee that EPA has selected a remedy regarding the Site, that potentially responsible parties have entered into a Consent Decree requiring implementation of such remedy, and that the United States District Court has entered the CD (identifying the name and civil action number of this case and the date the CD was entered by the Court); and

                (2)     Notify EPA of the name and address of the proposed transferee and provide EPA with a copy of the notice that it provided to the proposed transferee.

20.     In the event of any Transfer of the Affected Property, unless the United States otherwise consents in writing, SDs shall continue to comply with their obligations under the CD, including their obligation to secure access and ensure compliance with any land, water, or other resource use restrictions regarding the Affected Property.

21.     Notwithstanding any provision of the CD, Plaintiff retains all of its access authorities and rights, as well as all of its rights to require land, water, or other resource use restrictions and Institutional Controls, including enforcement authorities related thereto, under CERCLA, RCRA, and any other applicable statute or regulations.

## IX.     FINANCIAL ASSURANCE

22.     In order to ensure completion of the Work, SDs shall secure financial assurance, initially in the amount of $9,035,000.00 ("Estimated Cost of the Work"), for the benefit of EPA. The financial assurance must be one or more of the mechanisms listed below, in a form substantially identical to the relevant sample documents available from the "Financial Assurance" category on the Cleanup Enforcement Model Language and Sample Documents Database at http://cfpub.epa.gov/compliance/models/, and satisfactory to EPA. SDs may use multiple mechanisms if they are limited to surety bonds guaranteeing payment, letters of credit, trust funds, and/or insurance policies.

a.     A surety bond guaranteeing payment and/or performance of the Work that is issued by a surety company among those listed as acceptable sureties on federal bonds as set forth in Circular 570 of the U.S. Department of the Treasury;

b.     An irrevocable letter of credit, payable to or at the direction of EPA, that is issued by an entity that has the authority to issue letters of credit and whose letter-of-credit operations are regulated and examined by a federal or state agency;

c.     A trust fund established for the benefit of EPA that is administered by a trustee that has the authority to act as a trustee and whose trust operations are regulated and examined by a federal or state agency;

d.     A policy of insurance that provides EPA with acceptable rights as a beneficiary thereof and that is issued by an insurance carrier that has the authority to issue insurance policies in the applicable jurisdiction(s) and whose insurance operations are regulated and examined by a federal or state agency;

e.     A demonstration by one or more SDs that each such SD meets the relevant financial test criteria of 40 C.F.R. § 264.143(f) and reporting requirements of this Section for the sum of the Estimated Cost of the Work and the amounts, if any, of other federal, state, or tribal environmental obligations financially assured through the use of a financial test or guarantee, accompanied by a standby funding commitment, which obligates SDs to pay funds to or at the direction of EPA, up to the amount financially assured through the use of this demonstration in the event of a Work Takeover; or

f.     A guarantee to fund or perform the Work executed in favor of EPA by one of the following: (1) a direct or indirect parent company of a SD; or (2) a company that has a "substantial business relationship" (as defined in 40 C.F.R. § 264.141(h)) with a SD; provided, however, that any company providing such a guarantee must demonstrate to EPA's satisfaction that it meets the relevant financial test criteria of 40 C.F.R. § 264.143(f) and reporting requirements of this Section for the sum of the Estimated Cost of the Work and the amounts, if any, of other federal, state, or tribal environmental obligations financially assured through the use of a financial test or guarantee.

23.    SDs have selected, and EPA has found satisfactory, as an initial financial assurance, a guarantee prepared in accordance with ¶ 22.f. Within 30 days after the Effective Date, or 30 days after EPA's approval of the form and substance of SDs' financial assurance, whichever is later, SDs shall secure all executed and/or otherwise finalized mechanisms or other documents consistent with the EPA-approved form of financial assurance and shall submit such mechanisms and documents to:

Paula V. Painter
Program Analyst
Superfund Enforcement and Community Engagement Branch
61 Forsyth Street, SW
Atlanta, Georgia 30303

and to the United States and EPA as specified in Section XX (Notices and Submissions).

24.    If SDs provide financial assurance by means of a demonstration or guarantee under ¶ 22.e or 22.f, the affected SDs shall also comply and shall ensure that their guarantors comply with the other relevant criteria and requirements of 40 C.F.R. § 264.143(f) and this Section, including, but not limited to: (a) the initial submission to EPA of required documents from the affected entity's chief financial officer and independent certified public accountant no later than 30 days after the Effective Date; (b) the annual resubmission of such documents within 90 days after the close of each such entity's fiscal year; and (c) the notification of EPA no later than 30 days, in accordance with ¶ 25, after any such entity determines that it no longer satisfies the relevant financial test criteria and requirements set forth at 40 C.F.R. § 264.143(f)(1). SDs agree that EPA may also, based on a belief that an affected entity may no longer meet the financial test requirements of ¶ 22.e or 22.f, require reports of financial condition at any time from such entity in addition to those specified in this Paragraph. For purposes of this Section, references in 40 C.F.R. Part 264, Subpart H, to: (1) the terms "current closure cost estimate," "current post-closure cost estimate," and "current plugging and abandonment cost estimate" include the Estimated Cost of the Work; (2) the phrase "the sum of the current closure and post-closure cost estimates and the current plugging and abandonment cost estimates" includes the sum of all environmental obligations (including obligations under CERCLA, RCRA, and any other federal, state, or tribal environmental obligation) guaranteed by such company or for which such company is otherwise financially obligated in addition to the Estimated Cost of the Work under this CD; (3) the terms "owner" and "operator" include each SD making a demonstration or obtaining a guarantee under ¶ 22.e or 22.f; and (4) the terms "facility" and "hazardous waste management facility" include the Site.

25.    SDs shall diligently monitor the adequacy of the financial assurance. If any SD becomes aware of any information indicating that the financial assurance provided under this Section is inadequate or otherwise no longer satisfies the requirements of this Section, such SD shall notify EPA of such information within seven days. If EPA determines that the financial assurance provided under this Section is inadequate or otherwise no longer satisfies the requirements of this Section, EPA will notify the affected SD of such determination. SDs shall, within 30 days after notifying EPA or receiving notice from EPA under this Paragraph, secure and submit to EPA for approval a proposal for a revised or alternative financial assurance mechanism that satisfies the requirements of this Section. EPA may extend this deadline for such time as is reasonably necessary for the affected SD, in the exercise of due diligence, to secure

and submit to EPA a proposal for a revised or alternative financial assurance mechanism, not to exceed 60 days. SDs shall follow the procedures of ¶ 27 (Modification of Financial Assurance) in seeking approval of, and submitting documentation for, the revised or alternative financial assurance mechanism. SDs' inability to secure and submit to EPA financial assurance in accordance with this Section shall in no way excuse performance of any other requirements of this CD, including, without limitation, the obligation of SDs to complete the Work in accordance with the terms of this CD.

26. **Access to Financial Assurance**.

a. If EPA issues a notice of implementation of a Work Takeover under ¶ 64.b, then, in accordance with any applicable financial assurance mechanism and/or related standby funding commitment, EPA is entitled to: (1) the performance of the Work; and/or (2) require that any funds guaranteed be paid in accordance with ¶ 26.d.

b. If EPA is notified by the issuer of a financial assurance mechanism that it intends to cancel such mechanism, and the affected SD fails to provide an alternative financial assurance mechanism in accordance with this Section at least 30 days prior to the cancellation date, the funds guaranteed under such mechanism must be paid prior to cancellation in accordance with ¶ 26.d.

c. If, upon issuance of a notice of implementation of a Work Takeover under ¶ 64.b, either: (1) EPA is unable for any reason to promptly secure the resources guaranteed under any applicable financial assurance mechanism and/or related standby funding commitment, whether in cash or in kind, to continue and complete the Work; or (2) the financial assurance is provided under ¶ 22.e or 22.f, then EPA may demand an amount, as determined by EPA, sufficient to cover the cost of the remaining Work to be performed. SDs shall, within 30 days of such demand, pay the amount demanded as directed by EPA.

d. Any amounts required to be paid under this ¶ 26 shall be, as directed by EPA: (i) paid to EPA in order to facilitate the completion of the Work by EPA or by another person; or (ii) deposited into an interest-bearing account, established at a duly chartered bank or trust company that is insured by the FDIC, in order to facilitate the completion of the Work by another person. If payment is made to EPA, EPA may deposit the payment into the EPA Hazardous Substance Superfund or into the CTS of Asheville, Inc. Superfund Site Special Account within the EPA Hazardous Substance Superfund to be retained and used to conduct or finance response actions at or in connection with the Site, or to be transferred by EPA to the EPA Hazardous Substance Superfund.

e. All EPA Work Takeover costs not paid under this ¶ 26 must be reimbursed as Future Response Costs under Section X (Payments for Response Costs).

27. **Modification of Amount, Form, or Terms of Financial Assurance**. SDs may submit, on any anniversary of the Effective Date or at any other time agreed to by the Parties, a request to reduce the amount, or change the form or terms, of the financial assurance mechanism. Any such request must be submitted to EPA in accordance with ¶ 23, and must include an estimate of the cost of the remaining Work, an explanation of the bases for the cost calculation, and a description of the proposed changes, if any, to the form or terms of the financial assurance. EPA will notify SDs of its decision to approve or disapprove a requested reduction or change

pursuant to this Paragraph. SDs may reduce the amount of the financial assurance mechanism only in accordance with: (a) EPA's approval; or (b) if there is a dispute, the agreement, final administrative decision, or final judicial decision resolving such dispute under Section XIII (Dispute Resolution). Any decision made by EPA on a request submitted under this Paragraph to change the form or terms of a financial assurance mechanism shall be made in EPA's sole and unreviewable discretion, and such decision shall not be subject to challenge by SDs pursuant to the dispute resolution provisions of this CD or in any other forum. Within 30 days after receipt of EPA's approval of, or the agreement or decision resolving a dispute relating to, the requested modifications pursuant to this Paragraph, SDs shall submit to EPA documentation of the reduced, revised, or alternative financial assurance mechanism in accordance with ¶ 23.

28. **Release, Cancellation, or Discontinuation of Financial Assurance**. SDs may release, cancel, or discontinue any financial assurance provided under this Section only: (a) if EPA issues a Certification of Work Completion under ¶ 4.8 (Certification of Work Completion) of the SOW; (b) in accordance with EPA's approval of such release, cancellation, or discontinuation; or (c) if there is a dispute regarding the release, cancellation or discontinuance of any financial assurance, in accordance with the agreement, final administrative decision, or final judicial decision resolving such dispute under Section XIII (Dispute Resolution).

## X.   PAYMENTS FOR FUTURE RESPONSE COSTS

29. **Payments by SDs for Future Response Costs**. SDs shall pay to EPA all Future Response Costs not inconsistent with the NCP.

   a. **Periodic Bills**. On a periodic basis, EPA will send SDs a bill requiring payment that includes a SCORPIOS Report, which includes direct and indirect costs incurred by EPA, its contractors, subcontractors, and DOJ. SDs shall make all payments within 30 days after SDs' receipt of each bill requiring payment, except as otherwise provided in ¶ 31, in accordance with ¶ 30.a (instructions for future response cost payments).

   b. **Deposit of Future Response Costs Payments**. The total amount to be paid by SDs pursuant to ¶ 29.a (Periodic Bills) shall be deposited by EPA in the CTS of Asheville, Inc. Superfund Site Special Account to be retained and used to conduct or finance response actions at or in connection with the Site, or to be transferred by EPA to the EPA Hazardous Substance Superfund, provided, however, that EPA may deposit a Future Response Costs payment directly into the EPA Hazardous Substance Superfund if, at the time the payment is received, EPA estimates that the CTS of Asheville, Inc. Superfund Site Special Account balance is sufficient to address currently anticipated future response actions to be conducted or financed by EPA at or in connection with the Site. Any decision by EPA to deposit a Future Response Costs payment directly into the EPA Hazardous Substance Superfund for this reason shall not be subject to challenge by SDs pursuant to the dispute resolution provisions of this CD or in any other forum.

30.     **Payment Instructions for SDs**.

    a.      **Future Response Costs Payments and Stipulated Penalties**.

        (1)     For all payments subject to this ¶ 30.a, SDs shall make such payment by Fedwire EFT, referencing the Site/Spill ID and DJ numbers. The Fedwire EFT payment must be sent as follows:

> Federal Reserve Bank of New York
> ABA = 021030004
> Account = 68010727
> SWIFT address = FRNYUS33
> 33 Liberty Street
> New York NY 10045
> Field Tag 4200 of the Fedwire message should read
>     "D 68010727 Environmental Protection Agency"

        (2)     For all payments made under this ¶ 30.a, SDs must include references to the Site/Spill ID and DJ numbers. At the time of any payment required to be made in accordance with ¶ 30.a, SDs shall send notices that payment has been made to the United States, EPA, and the EPA Cincinnati Finance Center, all in accordance with ¶ 85. All notices must include references to the Site/Spill ID and DJ numbers.

31.     **Contesting Future Response Costs**. Any SD may submit a Notice of Dispute, initiating the procedures of Section XIII (Dispute Resolution), regarding any Future Response Costs billed under ¶ 29 (Payments by SDs for Future Response Costs) if any SD determines that EPA has made a mathematical error or included a cost item that is not within the definition of Future Response Costs, or if any SD believes EPA incurred excess costs as a direct result of an EPA action that was inconsistent with a specific provision or provisions of the NCP or this CD. Such Notice of Dispute shall be submitted in writing within 30 days after receipt of the bill and must be sent to the United States pursuant to Section XX (Notices and Submissions). Such Notice of Dispute shall specifically identify the contested Future Response Costs and the basis for objection. If any SD submits a Notice of Dispute, SDs shall within the 30-day period, also as a requirement for initiating the dispute, pay all uncontested Future Response Costs to the United States, and the SD(s) contesting the costs shall establish, in a duly chartered bank or trust company, an interest-bearing escrow account that is insured by the Federal Deposit Insurance Corporation (FDIC), and remit or cause to be remitted to that escrow account funds equivalent to the amount of the contested Future Response Costs. SDs shall send to the United States, as provided in Section XX (Notices and Submissions), a copy of the transmittal letter and check paying the uncontested Future Response Costs, and the SD(s) contesting the costs shall send to the United States, as provided in Section XX (Notices and Submissions), a copy of the correspondence that establishes and funds the escrow account, including, but not limited to, information containing the identity of the bank and bank account under which the escrow account is established as well as a bank statement showing the initial balance of the escrow account. If the United States prevails in the dispute, SDs shall pay from the escrow account the sums due (plus accrued interest) to the United States within seven days after the resolution of the dispute. If the SD(s) prevail(s) concerning any aspect of the contested costs, SDs shall pay that portion of the costs for which they did not prevail to the United States from the escrow account within seven days after the resolution of the dispute, and the SD(s) contesting the costs shall pay

any associated accrued interest to the United States within seven days after the resolution of the dispute. The SD(s) shall be disbursed any balance of the escrow account. All payments to the United States under this Paragraph shall be made in accordance with ¶ 30.a (instructions for future response cost payments). The dispute resolution procedures set forth in this Paragraph, in conjunction with the procedures set forth in Section XIII (Dispute Resolution), shall be the exclusive mechanisms for resolving disputes regarding SDs' obligation to reimburse the United States for its Future Response Costs.

32.     **Interest**. In the event that any payment for Future Response Costs required under this Section is not made by the date required, SDs shall pay Interest on the unpaid balance. The Interest on Future Response Costs shall begin to accrue on the date of the bill. The Interest shall accrue through the date of SDs' payment. Payments of Interest made under this Paragraph shall be in addition to such other remedies or sanctions available to Plaintiff by virtue of SDs' failure to make timely payments under this Section including, but not limited to, payment of stipulated penalties pursuant to ¶ 48 (Stipulated Penalty Amounts – Work).

## XI.     INDEMNIFICATION AND INSURANCE

33.     **SDs' Indemnification of the United States**.

a.     The United States does not assume any liability by entering into this CD or by virtue of any designation of SDs as EPA's authorized representatives under Section 104(e) of CERCLA, 42 U.S.C. § 9604(e). SDs shall indemnify, save, and hold harmless the United States and its officials, agents, employees, contractors, subcontractors, and representatives for or from any and all claims or causes of action arising from, or on account of, negligent or other wrongful acts or omissions of SDs, their officers, directors, employees, agents, contractors, subcontractors, and any persons acting on SDs' behalf or under their control, in carrying out activities pursuant to this CD, including, but not limited to, any claims arising from any designation of SDs as EPA's authorized representatives under Section 104(e) of CERCLA. Further, SDs agree to pay the United States all costs it incurs including, but not limited to, attorneys' fees and other expenses of litigation and settlement arising from, or on account of, claims made against the United States based on negligent or other wrongful acts or omissions of SDs, their officers, directors, employees, agents, contractors, subcontractors, and any persons acting on their behalf or under their control, in carrying out activities pursuant to this CD. The United States shall not be held out as a party to any contract entered into by or on behalf of SDs in carrying out activities pursuant to this CD. Neither SDs nor any such contractor shall be considered an agent of the United States.

b.     The United States shall give SDs notice of any claim for which the United States plans to seek indemnification pursuant to this ¶ 33, and shall consult with SDs prior to settling such claim.

34.     SDs covenant not to sue and agree not to assert any claims or causes of action against the United States for damages or reimbursement or for set-off of any payments made or to be made to the United States, arising from or on account of any contract, agreement, or arrangement between any one or more of SDs and any person for performance of Work on or relating to the Site, including, but not limited to, claims on account of construction delays. In addition, SDs shall indemnify, save and hold harmless the United States with respect to any and all claims for damages or reimbursement arising from or on account of any contract, agreement,

or arrangement between any one or more of SDs and any person for performance of Work on or relating to the Site, including, but not limited to, claims on account of construction delays.

35. **Insurance**. No later than 15 days before commencing any on-site Work, SDs shall secure, and shall maintain until the first anniversary after issuance of EPA's Certification of RA Completion pursuant to ¶ 4.6 (Certification of RA Completion) of the SOW commercial general liability insurance with limits of $1,000,000.00, for any one occurrence, and automobile liability insurance with limits of $1,000,000.00, combined single limit, naming the United States as an additional insured with respect to all liability arising out of the activities performed by or on behalf of SDs pursuant to this CD. In addition, for the duration of this CD, SDs shall satisfy, or shall ensure that their contractors or subcontractors satisfy, all applicable laws and regulations regarding the provision of worker's compensation insurance for all persons performing the Work on behalf of SDs in furtherance of this CD. Prior to commencement of the Work, SDs shall provide to EPA certificates of such insurance and a copy of the relevant portions of the applicable insurance policy. SDs shall resubmit such certificates and copies of policies each year on the anniversary of the Effective Date. If SDs demonstrate by evidence satisfactory to EPA that any contractor or subcontractor maintains insurance equivalent to that described above, or insurance covering the same risks but in a lesser amount, then, with respect to that contractor or subcontractor, SDs need provide only that portion of the insurance described above that is not maintained by the contractor or subcontractor.

## XII.    FORCE MAJEURE

36.    "Force majeure," for purposes of this CD, is defined as any event arising from causes beyond the control of SDs, of any entity controlled by SDs, or of SDs' contractors that delays or prevents the performance of any obligation under this CD despite SDs' best efforts to fulfill the obligation. The requirement that SDs exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential force majeure and best efforts to address the effects of any potential force majeure: (a) as it is occurring; and (b) following the potential force majeure such that the delay and any adverse effects of the delay are minimized to the greatest extent possible. "Force majeure" does not include financial inability to complete the Work or a failure to achieve the Performance Standards.

37.    If any event occurs or has occurred that may delay the performance of any obligation under this CD for which SDs intend or may intend to assert a claim of force majeure, SDs shall notify EPA's Project Coordinator orally or, in his or her absence, EPA's Alternate Project Coordinator or, in the event both of EPA's designated representatives are unavailable, the Director of the Superfund Division, EPA Region 4, within three working days of when SDs first knew that the event might cause a delay. Within seven days thereafter, SDs shall provide in writing to EPA an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; SDs' rationale for attributing such delay to a force majeure; and a statement as to whether, in the opinion of SDs, such event may cause or contribute to an endangerment to public health or welfare, or the environment. SDs shall include with any notice all available documentation supporting their claim that the delay was attributable to a force majeure. SDs shall be deemed to know of any circumstance of which SDs, any entity controlled by SDs, or SDs' contractors or subcontractors knew or should have known. Failure to comply with the

above requirements regarding an event shall preclude SDs from asserting any claim of force majeure regarding that event, provided, however, that if EPA, despite the late or incomplete notice, is able to assess to its satisfaction whether the event is a force majeure under ¶ 36 and whether SDs have exercised their best efforts under ¶ 36, EPA may, in its unreviewable discretion, excuse in writing SDs' failure to submit timely or complete notices under this Paragraph.

38.    If EPA agrees that the delay or anticipated delay is attributable to a force majeure, the time for performance of the obligations under this CD that are affected by the force majeure will be extended by EPA for such time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the force majeure shall not, of itself, extend the time for performance of any other obligation. If EPA does not agree that the delay or anticipated delay has been or will be caused by a force majeure, EPA will notify SDs in writing of its decision. If EPA agrees that the delay is attributable to a force majeure, EPA will notify SDs in writing of the length of the extension, if any, for performance of the obligations affected by the force majeure.

39.    If any SD elects to invoke the dispute resolution procedures set forth in Section XIII (Dispute Resolution) regarding EPA's decision, they shall do so no later than 15 days after receipt of EPA's notice. In any such proceeding, the SD(s) invoking dispute resolution shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a force majeure, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that SDs complied with the requirements of ¶¶ 36 and 37. If SDs carry this burden, the delay at issue shall be deemed not to be a violation by SDs of the affected obligation of this CD identified to EPA and the Court.

40.    The failure by EPA to timely complete any obligation under the CD or under the SOW is not a violation of the CD, provided, however, that if such failure prevents SDs from meeting one or more deadlines in the SOW, SDs may seek relief under this Section.

## XIII.  DISPUTE RESOLUTION

41.    Unless otherwise expressly provided for in this CD, the dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes regarding this CD. However, the procedures set forth in this Section shall not apply to actions by the United States to enforce obligations of SDs that have not been disputed in accordance with this Section.

42.    A dispute shall be considered to have arisen when one party sends the other parties a written Notice of Dispute. Any dispute regarding this CD shall in the first instance be the subject of informal negotiations between the parties to the dispute. The period for informal negotiations shall not exceed 20 days from the time the dispute arises, unless it is modified by written agreement of the parties to the dispute.

43.    **Statements of Position**.

        a.    In the event that the parties cannot resolve a dispute by informal negotiations under the preceding Paragraph, then the position advanced by EPA shall be considered binding unless, within 30 days after the conclusion of the informal negotiation period,

a SD invokes the formal dispute resolution procedures of this Section by serving on the United States a written Statement of Position on the matter in dispute, including, but not limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by such SD. The Statement of Position shall specify the SD's or SDs position as to whether formal dispute resolution should proceed under ¶ 44 (Record Review) or 45.

        b.      Within 30 days after receipt of a SD's or SDs' Statement of Position, EPA will serve on SDs its Statement of Position, including, but not limited to, any factual data, analysis, or opinion supporting that position and all supporting documentation relied upon by EPA. EPA's Statement of Position shall include a statement as to whether formal dispute resolution should proceed under ¶ 44 (Record Review) or 45. Within 14 days after receipt of EPA's Statement of Position, SDs may submit a Reply.

        c.      If there is disagreement between EPA and SDs as to whether dispute resolution should proceed under ¶ 44 (Record Review) or 45, the parties to the dispute shall follow the procedures set forth in the Paragraph determined by EPA to be applicable. However, if any SD ultimately appeals to the Court to resolve the dispute, the Court shall determine which Paragraph is applicable in accordance with the standards of applicability set forth in ¶¶ 44 and 45.

        44.      **Record Review**. Formal dispute resolution for disputes pertaining to the selection or adequacy of any response action and all other disputes that are accorded review on the administrative record under applicable principles of administrative law shall be conducted pursuant to the procedures set forth in this Paragraph. For purposes of this Paragraph, the adequacy of any response action includes, without limitation, the adequacy or appropriateness of plans, procedures to implement plans, or any other items requiring approval by EPA under this CD, and the adequacy of the performance of response actions taken pursuant to this CD. Nothing in this CD shall be construed to allow any dispute by SDs regarding the validity of the IROD's provisions.

        a.      An administrative record of the dispute shall be maintained by EPA and shall contain all statements of position, including supporting documentation, submitted pursuant to this Section. Where appropriate, EPA may allow submission of supplemental statements of position by the parties to the dispute.

        b.      The Director of the Superfund Division, EPA Region 4, will issue a final administrative decision resolving the dispute based on the administrative record described in ¶ 44.a. This decision shall be binding upon SDs, subject only to the right to seek judicial review pursuant to ¶¶ 44.c and 44.d.

        c.      Any administrative decision made by EPA pursuant to ¶ 44.b shall be reviewable by this Court, provided that a motion for judicial review of the decision is filed by SDs with the Court and served on all Parties within 10 days after receipt of EPA's decision. The motion shall include a description of the matter in dispute, the efforts made by the parties to resolve it, the relief requested, and the schedule, if any, within which the dispute must be resolved to ensure orderly implementation of this CD. The United States may file a response to SDs' motion.

d.     In proceedings on any dispute governed by this Paragraph, SDs shall have the burden of demonstrating that the decision of the Superfund Division Director is arbitrary and capricious or otherwise not in accordance with law. Judicial review of EPA's decision shall be on the administrative record compiled pursuant to ¶ 44.a.

45.     Formal dispute resolution for disputes that neither pertain to the selection or adequacy of any response action nor are otherwise accorded review on the administrative record under applicable principles of administrative law, shall be governed by this Paragraph.

a.     The Director of the Superfund Division, EPA Region 4, will issue a final decision resolving the dispute based on the statements of position and reply, if any, served under ¶ 43. The Superfund Division Director's decision shall be binding on SDs unless, within 10 days after receipt of the decision, SDs file with the Court and serve on the parties a motion for judicial review of the decision setting forth the matter in dispute, the efforts made by the parties to resolve it, the relief requested, and the schedule, if any, within which the dispute must be resolved to ensure orderly implementation of the CD. The United States may file a response to SDs' motion.

b.     Notwithstanding ¶ M (CERCLA § 113(j) record review of IROD and Work) of Section I (Background), judicial review of any dispute governed by this Paragraph shall be governed by applicable principles of law.

46.     The invocation of formal dispute resolution procedures under this Section does not extend, postpone, or affect in any way any obligation of SDs under this CD, except as provided in ¶ 31 (Contesting Future Response Costs), as agreed by EPA, or as determined by the Court. Stipulated penalties with respect to the disputed matter shall continue to accrue, but payment shall be stayed pending resolution of the dispute, as provided in ¶ 54. Notwithstanding the stay of payment, stipulated penalties shall accrue from the first day of noncompliance with any applicable provision of this CD. In the event that the SD(s) who invoked dispute resolution do(es) not prevail on the disputed issue, stipulated penalties shall be assessed and paid by the SD(s) who invoked dispute resolution as provided in Section XIV (Stipulated Penalties).

## XIV.   STIPULATED PENALTIES

47.     SDs shall be liable for stipulated penalties in the amounts set forth in ¶¶ 48 and 49 to the United States for failure to comply with the requirements of this CD specified below, unless excused under Section XII (Force Majeure). "Compliance" by SDs shall include completion of all activities and obligations, including payments, required under this CD, or any deliverable approved under this CD, in accordance with all applicable requirements of law, this CD, the SOW, and any deliverables approved under this CD and within the specified time schedules established by and approved under this CD.

48.     Stipulated Penalty Amounts - Work (Including Payments and Excluding Deliverables).

a.     The following stipulated penalties shall accrue per violation per day for any noncompliance identified in ¶ 48.b:

| Period of Noncompliance | Penalty Per Violation Per Day |
|---|---|
| 1st through 14th day | $500.00 |
| 15th through 30th day | $1,000.00 |
| 31st day and beyond | $2,500.00 |

b.      Compliance Milestones.

(1)     Designating a Project Coordinator and Supervising Contractor according to Paragraph 9;

(2)     Complying with emergency release response and reporting requirements according to Paragraph 11;

(3)     Conducting community involvement activities, if required, pursuant to Paragraph 12;

(4)     Paying undisputed Future Response Costs according to Paragraph 29;

(5)     Placing disputed costs in an escrow account as required by Paragraph 31;

(6)     Securing insurance as required by Paragraph 35; and

(7)     Establishing and maintaining financial assurance in compliance with the timelines and other substantive and procedural requirements of Section IX (Financial Assurance).

49.     **Stipulated Penalty Amounts - Deliverables**.

a.      **Material Defects**. If an initially submitted or resubmitted deliverable contains a material defect, and the deliverable is disapproved or modified by EPA under ¶ 6.6(a) (Initial Submissions) or 6.6(b) (Resubmissions) of the SOW due to such material defect, then the material defect shall constitute a lack of compliance for purposes of ¶ 47. The provisions of Section XIII (Dispute Resolution) and Section XIV (Stipulated Penalties) shall govern the accrual and payment of any stipulated penalties regarding SDs' submissions under this CD.

b.      The following stipulated penalties shall accrue per violation per day for failure to submit timely or adequate deliverables pursuant to the CD:

| Period of Noncompliance | Penalty Per Violation Per Day |
|---|---|
| 1st through 14th day | $500.00 |
| 15th through 30th day | $1,000.00 |
| 31st day and beyond | $2,500.00 |

50.     In the event that EPA assumes performance of a portion or all of the Work pursuant to ¶ 64 (Work Takeover), SDs shall be liable for a stipulated penalty in the amount of $500,000.00. Stipulated penalties under this Paragraph are in addition to the remedies available under ¶¶ 26 (Access to Financial Assurance) and 64 (Work Takeover).

51.     All penalties shall begin to accrue on the day after the complete performance is due or the day a violation occurs and shall continue to accrue through the final day of the correction of the noncompliance or completion of the activity. However, stipulated penalties shall not accrue: (a) with respect to a deficient submission under ¶ 6.6 (Approval of Deliverables) of the SOW, during the period, if any, beginning on the 31st day after EPA's receipt of such submission until the date that EPA notifies SDs of any deficiency; (b) with respect to a decision by the Director of the Superfund Division, EPA Region 4, under ¶ 44.b or 45.a of Section XIII (Dispute Resolution), during the period, if any, beginning on the 21st day after the date that SDs' reply to EPA's Statement of Position is received until the date that the Director issues a final decision regarding such dispute; or (c) with respect to judicial review by this Court of any dispute under Section XIII (Dispute Resolution), during the period, if any, beginning on the 31st day after the Court's receipt of the final submission regarding the dispute until the date that the Court issues a final decision regarding such dispute. Nothing in this CD shall prevent the simultaneous accrual of separate penalties for separate violations of this CD.

52.     Following EPA's determination that SDs have failed to comply with a requirement of this CD, EPA may give SDs written notification of the same and describe the noncompliance. EPA may send SDs a written demand for payment of the penalties. However, penalties shall accrue as provided in the preceding Paragraph regardless of whether EPA has notified SDs of a violation.

53.     All penalties accruing under this Section shall be due and payable to the United States within 30 days after SDs' receipt from EPA of a demand for payment of the penalties, unless SDs invoke the Dispute Resolution procedures under Section XIII (Dispute Resolution) within the 30-day period. All payments to the United States under this Section shall indicate that the payment is for stipulated penalties and shall be made in accordance with ¶ 30.a (instructions for future response cost payments).

54.     Penalties shall continue to accrue as provided in ¶ 51 during any dispute resolution period, but need not be paid until the following:

        a.      If the dispute is resolved by agreement of the parties or by a decision of EPA that is not appealed to this Court, accrued penalties determined to be owed shall be paid to EPA within 15 days after the agreement or the receipt of EPA's decision or order;

        b.      If the dispute is appealed to this Court and the United States prevails in whole or in part, SDs shall pay all accrued penalties determined by the Court to be owed to EPA within 60 days after receipt of the Court's decision or order, except as provided in ¶ 54.c;

        c.      If the District Court's decision is appealed by any Party, SDs shall pay all accrued penalties determined by the District Court to be owed to the United States into an interest-bearing escrow account, established at a duly chartered bank or trust company that is insured by the FDIC, within 60 days after receipt of the Court's decision or order. Penalties shall be paid into this account as they continue to accrue, at least every 60 days. Within 15 days after receipt of the final appellate court decision, the escrow agent shall pay the balance of the account to EPA or to SDs to the extent that they prevail.

55.     If SDs fail to pay stipulated penalties when due, SDs shall pay Interest on the unpaid stipulated penalties as follows: (a) if SDs have timely invoked dispute resolution such

that the obligation to pay stipulated penalties has been stayed pending the outcome of dispute resolution, Interest shall accrue from the date stipulated penalties are due pursuant to ¶ 54 until the date of payment; and (b) if SDs fail to timely invoke dispute resolution, Interest shall accrue from the date of demand under ¶ 53 until the date of payment. If SDs fail to pay stipulated penalties and Interest when due, the United States may institute proceedings to collect the penalties and Interest.

56. The payment of penalties and Interest, if any, shall not alter in any way SDs' obligation to complete the performance of the Work required under this CD.

57. Nothing in this CD shall be construed as prohibiting, altering, or in any way limiting the ability of the United States to seek any other remedies or sanctions available by virtue of SDs' violation of this CD or of the statutes and regulations upon which it is based, including, but not limited to, penalties pursuant to Section 122(*l*) of CERCLA, 42 U.S.C. § 9622(*l*), provided, however, that the United States shall not seek civil penalties pursuant to Section 122(*l*) of CERCLA for any violation for which a stipulated penalty is provided in this CD, except in the case of a willful violation of this CD.

58. Notwithstanding any other provision of this Section, the United States may, in its unreviewable discretion, waive any portion of stipulated penalties that have accrued pursuant to this CD.

## XV. COVENANTS BY PLAINTIFF

59. **Covenants for SDs by United States**.

Except as provided in ¶ 63 (General Reservations of Rights), the United States covenants not to sue or to take administrative action against SDs pursuant to Sections 106 and 107(a) of CERCLA for the Work and Future Response Costs. These covenants shall take effect upon the Effective Date. These covenants are conditioned upon the satisfactory performance by SDs of their obligations under this CD. These covenants extend only to SDs and do not extend to any other person.

60. **United States' Pre-Certification Reservations**. Notwithstanding any other provision of this CD, the United States reserves, and this CD is without prejudice to, the right to institute proceedings in this action or in a new action, and/or to issue an administrative order, seeking to compel SDs to perform further response actions relating to the Site and/or to pay the United States for additional costs of response if: (a) prior to Certification of RA Completion, (1) conditions at the Site, previously unknown to EPA, are discovered, or (2) information, previously unknown to EPA, is received, in whole or in part; and (b) EPA determines that these previously unknown conditions or information together with any other relevant information indicates that the RA is not protective of human health or the environment.

61. **United States' Post-Certification Reservations**. Notwithstanding any other provision of this CD, the United States reserves, and this CD is without prejudice to, the right to institute proceedings in this action or in a new action, and/or to issue an administrative order, seeking to compel SDs to perform further response actions relating to the Site and/or to pay the United States for additional costs of response if: (a) subsequent to Certification of RA Completion, (1) conditions at the Site, previously unknown to EPA, are discovered, or

(2) information, previously unknown to EPA, is received, in whole or in part; and (b) EPA determines that these previously unknown conditions or this information together with other relevant information indicate that the RA is not protective of human health or the environment.

62.     For purposes of ¶ 60 (United States' Pre-Certification Reservations), the information and the conditions known to EPA will include only that information and those conditions known to EPA as of the date the IROD was signed and set forth in the IROD for the Site and the administrative record supporting the IROD. For purposes of ¶ 61 (United States' Post-Certification Reservations), the information and the conditions known to EPA shall include only that information and those conditions known to EPA as of the date of Certification of RA Completion and set forth in the IROD, the administrative record supporting the IROD, the post-ROD administrative record, or in any information received by EPA pursuant to the requirements of this CD prior to Certification of RA Completion.

63.     **General Reservations of Rights**. The United States reserves, and this CD is without prejudice to, all rights against SDs with respect to all matters not expressly included within Plaintiff's covenants. Notwithstanding any other provision of this CD, the United States reserves all rights against SDs with respect to:

          a.     liability for failure by SDs to meet a requirement of this CD;

          b.     liability arising from the past, present, or future disposal, release, or threat of release of Waste Material outside of the Site;

          c.     liability based on the ownership of the Site by SDs when such ownership commences after signature of this CD by SDs;

          d.      liability based on the operation of the Site by SDs when such operation commences after signature of this CD by SDs and does not arise solely from SDs' performance of the Work;

          e.     liability based on SDs' transportation, treatment, storage, or disposal, or arrangement for transportation, treatment, storage, or disposal of Waste Material at or in connection with the Site, other than as provided in the IROD, the Work, or otherwise ordered by EPA, after signature of this CD by SDs;

          f.     liability for damages for injury to, destruction of, or loss of natural resources, and for the costs of any natural resource damage assessments;

          g.     criminal liability;

          h.     liability for violations of federal or state law that occur during or after implementation of the Work; and

          i.     liability, prior to achievement of Performance Standards, for additional response actions that EPA determines are necessary to achieve and maintain Performance Standards or to carry out and maintain the effectiveness of the remedy set forth in the IROD, but that cannot be required pursuant to ¶ 13 (Modification of SOW or Related Deliverables);

          j.     liability for the final response action;

k.      liability for costs that the United States will incur regarding the Site but that are not within the definition of Future Response Costs; and

l.      liability for Past Response Costs.

64.    **Work Takeover**.

a.      In the event EPA determines that SDs: (1) have ceased implementation of any portion of the Work; (2) are seriously or repeatedly deficient or late in their performance of the Work; or (3) are implementing the Work in a manner that may cause an endangerment to human health or the environment, EPA may issue a written notice ("Work Takeover Notice") to SDs. Any Work Takeover Notice issued by EPA will specify the grounds upon which such notice was issued and will provide SDs a period of 10 days within which to remedy the circumstances giving rise to EPA's issuance of such notice.

b.      If, after expiration of the 10-day notice period specified in ¶ 64.a, SDs have not remedied to EPA's satisfaction the circumstances giving rise to EPA's issuance of the relevant Work Takeover Notice, EPA may at any time thereafter assume the performance of all or any portion(s) of the Work as EPA deems necessary ("Work Takeover"). EPA will notify SDs in writing (which writing may be electronic) if EPA determines that implementation of a Work Takeover is warranted under this ¶ 64.b. Funding of Work Takeover costs is addressed under ¶ 26 (Access to Financial Assurance).

c.      SDs may invoke the procedures set forth in ¶ 44 (Record Review), to dispute EPA's implementation of a Work Takeover under ¶ 64.b. However, notwithstanding SDs' invocation of such dispute resolution procedures, and during the pendency of any such dispute, EPA may in its sole discretion commence and continue a Work Takeover under ¶ 64.b until the earlier of (1) the date that SDs remedy, to EPA's satisfaction, the circumstances giving rise to EPA's issuance of the relevant Work Takeover Notice, or (2) the date that a final decision is rendered in accordance with ¶ 44 (Record Review) requiring EPA to terminate such Work Takeover.

65.    Notwithstanding any other provision of this CD, the United States retains all authority and reserves all rights to take any and all response actions authorized by law.

## XVI.   COVENANTS BY SDs

66.    **Covenants by SDs**. Subject to the reservations in ¶ 68, SDs covenant not to sue and agree not to assert any claims or causes of action against the United States with respect to the Work, past response actions regarding the Site, Future Response Costs, and this CD, including, but not limited to:

a.      any direct or indirect claim for reimbursement from the EPA Hazardous Substance Superfund through CERCLA §§ 106(b)(2), 107, 111, 112 or 113, or any other provision of law;

b.      any claims under CERCLA §§ 107 or 113, RCRA Section 7002(a), 42 U.S.C. § 6972(a), or state law regarding the Work, past response actions regarding the Site, Future Response Costs, and this CD; or

c. any claims arising out of response actions at or in connection with the Site, including any claim under the United States Constitution, the North Carolina Constitution, the Tucker Act, 28 U.S.C. § 1491, the Equal Access to Justice Act, 28 U.S.C. § 2412, or at common law.

67. Except as provided in ¶¶ 70 (Waiver of Claims by SDs) and 76 (Res Judicata and Other Defenses), the covenants in this Section shall not apply if the United States brings a cause of action or issues an order pursuant to any of the reservations in Section XV (Covenants by Plaintiff), other than in ¶¶ 63.a (claims for failure to meet a requirement of the CD), 63.g (criminal liability), and 63.h (violations of federal/state law during or after implementation of the Work), but only to the extent that SDs' claims arise from the same response action, response costs, or damages that the United States is seeking pursuant to the applicable reservation.

68. SDs reserve, and this CD is without prejudice to, claims against the United States, subject to the provisions of Chapter 171 of Title 28 of the United States Code, and brought pursuant to any statute other than CERCLA or RCRA and for which the waiver of sovereign immunity is found in a statute other than CERCLA or RCRA, for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the United States, as that term is defined in 28 U.S.C. § 2671, while acting within the scope of his or her office or employment under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. However, the foregoing shall not include any claim based on EPA's selection of response actions, or the oversight or approval of SDs' deliverables or activities.

69. Nothing in this CD shall be deemed to constitute approval or preauthorization of a claim within the meaning of Section 111 of CERCLA, 42 U.S.C. § 9611, or 40 C.F.R. § 300.700(d).

70. **Waiver of Claims by SDs**.

a. SDs agree not to assert any claims and to waive all claims or causes of action (including but not limited to claims or causes of action under Sections 107(a) and 113 of CERCLA) that they may have:

(1) **De Micromis Waiver**. For all matters relating to the Site against any person where the person's liability to SDs with respect to the Site is based solely on having arranged for disposal or treatment, or for transport for disposal or treatment, of hazardous substances at the Site, or having accepted for transport for disposal or treatment of hazardous substances at the Site, if all or part of the disposal, treatment, or transport occurred before April 1, 2001, and the total amount of material containing hazardous substances contributed by such person to the Site was less than 110 gallons of liquid materials or 200 pounds of solid materials; and

(2) **Ability to Pay Waiver**. For response costs relating to the Site against any person that has entered or in the future enters into a final settlement based on limited ability to pay with EPA with respect to the Site.

b.    **Exceptions to Waivers**.

(1)    The waivers under this ¶ 70 shall not apply with respect to any defense, claim, or cause of action that a SD may have against any person otherwise covered by such waivers if such person asserts a claim or cause of action relating to the Site against such SD.

(2)    The waiver under ¶ 70.a(1) (De Micromis Waiver) shall not apply to any claim or cause of action against any person otherwise covered by such waiver if EPA determines that: (i) the materials containing hazardous substances contributed to the Site by such person contributed significantly or could contribute significantly, either individually or in the aggregate, to the cost of the response action or natural resource restoration at the Site; or (ii) such person has failed to comply with any information request or administrative subpoena issued pursuant to Section 104(e) or 122(e)(3)(B) of CERCLA, 42 U.S.C. § 9604(e) or 9622(e)(3)(B), or Section 3007 of RCRA, 42 U.S.C. § 6927, or has impeded or is impeding, through action or inaction, the performance of a response action or natural resource restoration with respect to the Site; or if (iii) such person has been convicted of a criminal violation for the conduct to which the waiver would apply and that conviction has not been vitiated on appeal or otherwise.

## XVII.  EFFECT OF SETTLEMENT; CONTRIBUTION

71.    Except as provided in ¶ 70 (Waiver of Claims by SDs), nothing in this CD shall be construed to create any rights in, or grant any cause of action to, any person not a Party to this CD. Except as provided in Section XVI (Covenants by SDs), each of the Parties expressly reserves any and all rights (including, but not limited to, pursuant to Section 113 of CERCLA, 42 U.S.C. § 9613), defenses, claims, demands, and causes of action that each Party may have with respect to any matter, transaction, or occurrence relating in any way to the Site against any person not a Party hereto. Nothing in this CD diminishes the right of the United States, pursuant to Section 113(f)(2) and (3) of CERCLA, 42 U.S.C. § 9613(f)(2)-(3), to pursue any such persons to obtain additional response costs or response action and to enter into settlements that give rise to contribution protection pursuant to Section 113(f)(2).

72.    The Parties agree, and by entering this CD this Court finds, that this CD constitutes a judicially-approved settlement pursuant to which each SD has, as of the Effective Date, resolved liability to the United States within the meaning of Section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2), and is entitled, as of the Effective Date, to protection from contribution actions or claims as provided by Section 113(f)(2) of CERCLA, or as may be otherwise provided by law, for the "matters addressed" in this CD. The "matters addressed" in this CD are the Work and Future Response Costs.

73.    The Parties further agree, and by entering this CD this Court finds, that the complaint filed by the United States in this action is a civil action within the meaning of Section 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1), and that this CD constitutes a judicially-approved settlement pursuant to which each Settling Defendant has, as of the Effective Date, resolved liability to the United States within the meaning of Section 113(f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B).

74.     Each SD shall, with respect to any suit or claim brought by it for matters related to this CD, notify the United States in writing no later than 60 days prior to the initiation of such suit or claim.

75.     Each SD shall, with respect to any suit or claim brought against it for matters related to this CD, notify in writing the United States within 10 days after service of the complaint on such SD. In addition, each SD shall notify the United States within 10 days after service or receipt of any Motion for Summary Judgment and within 10 days after receipt of any order from a court setting a case for trial.

76.     **Res Judicata and Other Defenses**. In any subsequent administrative or judicial proceeding initiated by the United States for injunctive relief, recovery of response costs, or other appropriate relief relating to the Site, SDs shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States in the subsequent proceeding were or should have been brought in the instant case; provided, however, that nothing in this Paragraph affects the enforceability of the covenants not to sue set forth in Section XV (Covenants by Plaintiff).

## XVIII. ACCESS TO INFORMATION

77.     SDs shall provide to EPA, upon request, copies of all records, reports, documents, and other information (including records, reports, documents, and other information in electronic form) (hereinafter referred to as "Records") within SDs' possession or control or that of their contractors or agents relating to activities at the Site or to the implementation of this CD, including, but not limited to, sampling, analysis, chain of custody records, manifests, trucking logs, receipts, reports, sample traffic routing, correspondence, or other documents or information regarding the Work. SDs may retain Records in either hard copy or electronic form, including in scanned portable document format. SDs shall also make available to EPA, for purposes of investigation, information gathering, or testimony, their employees, agents, or representatives with knowledge of relevant facts concerning the performance of the Work.

78.     **Privileged and Protected Claims**.

a.      SDs may assert that all or part of a Record requested by Plaintiff is privileged or protected as provided under federal law, in lieu of providing the Record, provided SDs comply with ¶ 78.b, and except as provided in ¶ 78.c.

b.      If SDs assert a claim of privilege or protection, they shall provide Plaintiff with the following information regarding such Record: its title; its date; the name, title, affiliation (e.g., company or firm), and address of the author, of each addressee, and of each recipient; a description of the Record's contents; and the privilege or protection asserted. If a claim of privilege or protection applies only to a portion of a Record, SDs shall provide the Record to Plaintiff in redacted form to mask the privileged or protected portion only. SDs shall retain all Records that they claim to be privileged or protected until Plaintiff has had a reasonable opportunity to dispute the privilege or protection claim and any such dispute has been resolved in the SDs' favor.

c.      SDs may make no claim of privilege or protection regarding: (1) any data regarding the Site, including, but not limited to, all sampling, analytical, monitoring, hydrogeologic, scientific, chemical, radiological or engineering data, or the portion of any other Record that evidences conditions at or around the Site; or (2) the portion of any Record that SDs are required to create or generate pursuant to this CD.

79.      **Business Confidential Claims**. SDs may assert that all or part of a Record provided to Plaintiff under this Section or Section XIX (Retention of Records) is business confidential to the extent permitted by and in accordance with Section 104(e)(7) of CERCLA, 42 U.S.C. § 9604(e)(7), and 40 C.F.R. § 2.203(b). SDs shall segregate and clearly identify all Records or parts thereof submitted under this CD for which SDs assert business confidentiality claims. Records submitted to EPA determined to be confidential by EPA will be afforded the protection specified in 40 C.F.R. Part 2, Subpart B. If no claim of confidentiality accompanies Records when they are submitted to EPA , or if EPA has notified SDs that the Records are not confidential under the standards of Section 104(e)(7) of CERCLA or 40 C.F.R. Part 2, Subpart B, the public may be given access to such Records without further notice to SDs.

80.      If relevant to the proceeding, the Parties agree that validated sampling or monitoring data generated in accordance with the SOW and reviewed and approved by EPA shall be admissible as evidence, without objection, in any proceeding under this CD.

81.      Notwithstanding any provision of this CD, Plaintiff retains all of its information gathering and inspection authorities and rights, including enforcement actions related thereto, under CERCLA, RCRA, and any other applicable statutes or regulations.

## XIX.   RETENTION OF RECORDS

82.      Until 10 years after EPA's Certification of Work Completion under ¶ 4.8 (Certification of Work Completion) of the SOW, each SD shall preserve and retain all non-identical copies of Records (including Records in electronic form) now in its possession or control or that come into its possession or control that relate in any manner to its liability under CERCLA with respect to the Site, provided, however, that SDs who are potentially liable as owners or operators of the Site must retain, in addition, all Records that relate to the liability of any other person under CERCLA with respect to the Site. Each SD must also retain, and instruct its contractors and agents to preserve, for the same period of time specified above all non-identical copies of the last draft or final version of any Records (including Records in electronic form) now in its possession or control or that come into its possession or control that relate in any manner to the performance of the Work, provided, however, that each SD (and its contractors and agents) must retain, in addition, copies of all data generated during the performance of the Work and not contained in the aforementioned Records required to be retained. Each of the above record retention requirements shall apply regardless of any corporate retention policy to the contrary.

83.      At the conclusion of this record retention period, SDs shall notify the United States at least 90 days prior to the destruction of any such Records, and, upon request by the United States, and except as provided in ¶ 78 (Privileged and Protected Claims), SDs shall deliver any such Records to EPA.

84.     Each SD certifies individually that, to the best of its knowledge and belief, after thorough inquiry, it has not altered, mutilated, discarded, destroyed, or otherwise disposed of any Records (other than identical copies) relating to its potential liability regarding the Site since notification of potential liability by the United States or the State and that it has fully complied with any and all EPA and State requests for information regarding the Site pursuant to Sections 104(e) and 122(e)(3)(B) of CERCLA, 42 U.S.C. §§ 9604(e) and 9622(e)(3)(B), and Section 3007 of RCRA, 42 U.S.C. § 6927, and state law.

## XX.    NOTICES AND SUBMISSIONS

85.     All approvals, consents, deliverables, modifications, notices, notifications, objections, proposals, reports, and requests specified in this CD must be in writing unless otherwise specified. Whenever, under this CD, notice is required to be given, or a report or other document is required to be sent, by one Party to another, it must be directed to the person(s) specified below at the address(es) specified below. Any Party may change the person and/or address applicable to it by providing notice of such change to all Parties. All notices under this Section are effective upon receipt, unless otherwise specified. Notices required to be sent to EPA, and not to the United States, should not be sent to the DOJ. Except as otherwise provided, notice to a Party by email (if that option is provided below) or by regular mail in accordance with this Section satisfies any notice requirement of the CD regarding such Party.

| | |
|---|---|
| **As to the United States**: | EES Case Management Unit<br>U.S. Department of Justice<br>Environment and Natural Resources Division<br>P.O. Box 7611<br>Washington, D.C. 20044-7611<br>eescdcopy.enrd@usdoj.gov<br>Re: DJ# 90-11-2-08135/2 |
| **As to EPA**: | Director, Superfund Division<br>U.S. Environmental Protection Agency<br>Region 4<br>61 Forsyth Street, S.W.<br>Atlanta, GA  30303 |
| **and**: | Craig Zeller<br>EPA Project Coordinator<br>U.S. Environmental Protection Agency<br>Region 4<br>61 Forsyth Street, S.W.<br>Atlanta, GA  30303<br>zeller.craig@epa.gov<br>(404) 562-8827 |
| **As to EPA Cincinnati Finance Center**: | EPA Cincinnati Finance Center<br>26 W. Martin Luther King Drive<br>Cincinnati, Ohio 45268<br>cinwd_acctsreceivable@epa.gov |

| As to CTS: | George Lytwynyshyn |
| | Director, Environmental Health & Safety |
| | CTS Corporation |
| | 2375 Cabot Drive |
| | Lisle, IL 60502 |
| | george.lytwynyshyn@ctscorp.com |
| | (630) 577-8879 |
| **As to Mills Gap Road Associates**: | William Clarke |
| | Roberts & Stevens, P.A. |
| | City Centre Building, Suite 400 |
| | 301 College Street |
| | Asheville, NC 28801 |
| | bclarke@roberts-stevens.com |
| | (828) 258-6919 |
| **As to Northrop Grumman Systems Corporation**: | Robert J. Ariatti |
| | Northrop Grumman Systems Corporation |
| | 2980 Fairview Park Drive |
| | Falls Church, VA 22042 |
| | robert.ariatti@ngc.com |
| | (703) 280-4093 |

## XXI. RETENTION OF JURISDICTION

86. This Court retains jurisdiction over both the subject matter of this CD and SDs for the duration of the performance of the terms and provisions of this CD for the purpose of enabling any of the Parties to apply to the Court at any time for such further order, direction, and relief as may be necessary or appropriate for the construction or modification of this CD, or to effectuate or enforce compliance with its terms, or to resolve disputes in accordance with Section XIII (Dispute Resolution).

## XXII. APPENDICES

87. The following appendices are attached to and incorporated into this CD:

"*Appendix A*" is the IROD.

"*Appendix B*" is the SOW.

"*Appendix C*" is the description and/or map of the Site.

"*Appendix D*" is the complete list of SDs.

## XXIII. MODIFICATION

88. Except as provided in ¶ 13 (Modification of SOW or Related Deliverables), material modifications to this CD, including the SOW, shall be in writing, signed by the United States and SDs, and shall be effective upon approval by the Court. Except as provided in ¶ 13, non-material modifications to this CD, including the SOW, shall be in writing and shall be

effective when signed by duly authorized representatives of the United States and SDs. A modification to the SOW shall be considered material if it implements a IROD amendment that fundamentally alters the basic features of the selected remedy within the meaning of 40 C.F.R. § 300.435(c)(2)(ii). Before providing its approval to any modification to the SOW, the United States will provide the State with a reasonable opportunity to review and comment on the proposed modification.

89.     Nothing in this CD shall be deemed to alter the Court's power to enforce, supervise, or approve modifications to this CD.

## XXIV. LODGING AND OPPORTUNITY FOR PUBLIC COMMENT

90.     This CD shall be lodged with the Court for at least 30 days for public notice and comment in accordance with Section 122(d)(2) of CERCLA, 42 U.S.C. § 9622(d)(2), and 28 C.F.R. § 50.7. The United States reserves the right to withdraw or withhold its consent if the comments regarding the CD disclose facts or considerations that indicate that the CD is inappropriate, improper, or inadequate. SDs consent to the entry of this CD without further notice.

91.     If for any reason the Court should decline to approve this CD in the form presented, this agreement is voidable at the sole discretion of any Party and the terms of the agreement may not be used as evidence in any litigation between the Parties.

## XXV. SIGNATORIES/SERVICE

92.     Each undersigned representative of a SD to this CD and the Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice certifies that he or she is fully authorized to enter into the terms and conditions of this CD and to execute and legally bind such Party to this document.

93.     Each SD agrees not to oppose entry of this CD by this Court or to challenge any provision of this CD unless the United States has notified SDs in writing that it no longer supports entry of the CD.

94.     Each SD shall identify, on the attached signature page, the name, address, and telephone number of an agent who is authorized to accept service of process by mail on behalf of that Party with respect to all matters arising under or relating to this CD. SDs agree to accept service in that manner and to waive the formal service requirements set forth in Rule 4 of the Federal Rules of Civil Procedure and any applicable local rules of this Court, including, but not limited to, service of a summons. SDs need not file an answer to the complaint in this action unless or until the Court expressly declines to enter this CD.

## XXVI. FINAL JUDGMENT

95.     This CD and its appendices constitute the final, complete, and exclusive agreement and understanding among the Parties regarding the settlement embodied in the CD. The Parties acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this CD.

96.     Upon entry of this CD by the Court, this CD shall constitute a final judgment between and among the United States and SDs. The Court finds that there is no just reason for delay and therefore enters this judgment as a final judgment under Fed. R. Civ. P. 54 and 58.

Signed: March 7, 2017

Dennis L. Howell
United States Magistrate Judge

Signature Page for the Consent Decree for Interim Remedial Design/Remedial Action
at the CTS of Asheville, Inc. Superfund Site


**FOR THE UNITED STATES OF AMERICA:**



_____          s/ Ellen Mahan_____
Dated                     ELLEN MAHAN
                              Deputy Section Chief
                              Environmental Enforcement Section
                              Environment and Natural Resources Division
                              United States Department of Justice




                              s/ Peter Krzywicki_____
                              Peter Krzywicki
                              Trial Attorney
                              U.S. Department of Justice
                              Environment and Natural Resources Division
                              Environmental Enforcement Section
                              P.O. Box 7611
                              Washington, DC  20044-7611




                              Jill Westmoreland Rose
                              United States Attorney
                              Western District of North Carolina




                              s/ Jon Ferry_____
                              JONATHAN H. FERRY
                              Assistant United States Attorney
                              Western District of North Carolina
                              100 Otis Street
                              Asheville, NC  28801

Signature Page for the Consent Decree for Interim Remedial Design/Remedial Action
at the CTS of Asheville, Inc. Superfund Site

**FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY:**


_____                    s/ Franklin Hill_____
Dated                              Franklin E. Hill
                                   Director
                                   Superfund Division
                                   U.S. Environmental Protection Agency, Region 4
                                   61 Forsyth Street, SW
                                   Atlanta, GA  30303



                                   s/ Stacey Haire_____
                                   Stacey A. Haire
                                   Senior Attorney
                                   Office of Regional Counsel
                                   U.S. Environmental Protection Agency, Region 4
                                   61 Forsyth Street, SW
                                   Atlanta, GA  30303

Signature Page for the Consent Decree for Interim Remedial Design/Remedial Action
at the CTS of Asheville, Inc. Superfund Site

**FOR CTS CORPORATION:**

_____                    s/ Luis Machado___
Dated                         Luis F. Machado
                              Vice President, General Counsel, & Secretary
                              Address:     CTS Corporation
                                           2375 Cabot Drive
                                           Lisle, IL 60532

Agent Authorized to Accept Service   Name (print):  Andrew Warren
on Behalf of Above-signed Party:     Title:         Deputy General Counsel
                                     Company:       CTS Corporation
                                     Address:       2375 Cabot Drive
                                                    Lisle, IL 60532
                                     Phone:         630-577-8871
                                     email:         andrew.warren@ctscorp.com

Signature Page for the Consent Decree for Interim Remedial Design/Remedial Action
at the CTS of Asheville, Inc. Superfund Site

**FOR MILLS GAP ROAD ASSOCIATES:**

_____                    s/ John A. Powell\_\_\_\_
Dated                                      Name (print): John A. Powell
                                                Title: Partner
                                                Address: 53 N. Market St., Ste. 11
                                                        Asheville, NC 28801


Agent Authorized to Accept Service     Name (print):  William Clarke
on Behalf of Above-signed Party:       Title:            Attorney
                                                        Company:     Roberts & Stevens, P.A.
                                                        Address:       301 College Street, Suite 400
                                                                            Asheville, N.C. 28801
                                                        Phone:         828-258-6919
                                                        email:          bclarke@roberts-stevens.com

Signature Page for the Consent Decree for Interim Remedial Design/Remedial Action
at the CTS of Asheville, Inc. Superfund Site

**FOR NORTHROP GRUMMAN SYSTEMS CORPORATION:**

_____                      s/ Mark Caylor_____
Dated                                    Name (print): Mark Caylor
                                         Title: Vice President
                                         Address: 2980 Fairview Park Dr.
                                                  Falls Church, VA 27042


Agent Authorized to Accept Service    Name (print):  CT Corporation System
on Behalf of Above-signed Party:      Title:         Registered Agent
                                      Company:       _____
                                      Address:       160 Mine Lake Court, Suite 200
                                                     Raleigh, N.C. 27615
                                      Phone:         _____
                                      email:         _____